Timothy J. Preso
Amanda D. Galvan
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org
agalvan@earthjustice.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; CONSERVATION NORTHWEST; DEFENDERS OF WILDLIFE; FRIENDS OF THE CLEARWATER; GREATER YELLOWSTONE COALITION; IDAHO CONSERVATION LEAGUE; JACKSON HOLE CONSERVATION ALLIANCE; KLAMATH-SISKIYOU WILDLANDS CENTER; and ROCKY MOUNTAIN WILD, | ) ) ) ) ) ) ) ) ) ) Case No. |
| Plaintiffs, | ) **COMPLAINT FOR** ) **DECLARATORY AND** ) **INJUNCTIVE RELIEF** |
| v. | ) ) |
| DAVID BERNHARDT, Secretary, U.S. Department of the Interior, in his official capacity; AURELIA SKIPWITH, Director, U.S. Fish and Wildlife Service, in her official capacity; and UNITED STATES FISH AND WILDLIFE SERVICE, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## INTRODUCTION

1.      This case challenges the United States Fish and Wildlife Service's ("FWS") failure to meet its mandatory statutory deadline to make a final determination on the proposed listing of the distinct population segment of the North American wolverine occurring in the contiguous United States as a threatened species under the Endangered Species Act ("ESA").

2.      This Court last examined FWS's conduct regarding the wolverine in a 2014 case challenging FWS's decision to withdraw its proposed rule listing the wolverine in the lower-48 states as threatened under the ESA.  In that case, this Court held that FWS had illegally withdrawn the proposed rule and directed FWS to take action in making a listing determination for the wolverine as expeditiously as possible.

3.      Nonetheless, in the more than three years that have passed since this Court's decision, FWS has failed to render a final decision on the wolverine listing, in violation of this Court's 2014 direction and the ESA.  16 U.S.C. § 1533(b)(6)(A)(i), (B)(iii).  The ESA authorizes this Court to order FWS to perform such unlawfully withheld agency action.  Id. § 1540(g).  Accordingly, plaintiffs now return to this Court seeking relief from FWS's continuing unlawful conduct.

**JURISDICTION, VENUE AND ADMINISTRATIVE REMEDIES**

4.      This action is brought pursuant to the Endangered Species Act, 16

U.S.C. § 1540(g)(1)(C) (failure of Secretary to perform nondiscretionary duty),

which waives the defendants' sovereign immunity.  This Court has jurisdiction

over plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and 16

U.S.C. § 1540(g)(1)(C) (ESA citizen-suit provision), and may issue a declaratory

judgment and further relief pursuant to 16 U.S.C. § 1540(g)(1)(C) and 28 U.S.C.

§§ 2201-02.

5.      Venue is proper in this District under 28 U.S.C. § 1391 because a

substantial part of the ESA violations alleged in this complaint occurred in this

District and a significant number of the remaining wolverines impacted by the

FWS's unlawful conduct are located in this District.

6.      Plaintiffs provided defendants with 60 days' written notice of

plaintiffs' intent to sue on January 16, 2020, as required by 16 U.S.C. § 1540(g)(2).

**PARTIES**

7.      Plaintiff Center for Biological Diversity (the "Center") is a nonprofit

organization dedicated to the preservation, protection and restoration of

biodiversity, native species and ecosystems.  The Center was founded in 1989 and

is based in Tucson, Arizona, with offices throughout the country.  The Center

works through science, law, and policy to secure a future for all species, great or

small, hovering on the brink of extinction. The Center is actively involved in species and habitat protection issues and has more than 74,000 members throughout the United States and the world. The Center brings this action on its own institutional behalf and on behalf of its members. Many of the Center's members and staff reside in, explore and enjoy mountain landscapes in the lower-48 states occupied by wolverines.

8.    Plaintiff Conservation Northwest is a non-profit conservation organization based in Bellingham, Washington. Conservation Northwest was founded in 1988 and now has more than 15,000 members and supporters. Conservation Northwest seeks to maintain the ecological integrity of the Northwest's wildlands and advocates for protection of imperiled wildlife such as the lynx, the fisher, and the wolverine.

9.    Plaintiff Defenders of Wildlife ("Defenders") is a non-profit conservation organization based in Washington, D.C., with offices across the country. Defenders has more than 1 million members and supporters across the nation, many of whom reside within the historic and current range of the wolverine. Defenders is dedicated to protecting and restoring all native wild animals and plants in their natural communities. Defenders has invested time and resources protecting the wolverine and its habitat, including advocating for monitoring and conservation of the species, and for listing the wolverine as an

endangered or threatened species under the ESA.  In addition, Defenders regularly

publishes information regarding species, including the wolverine, for the use of its

members and the public.

10.    Plaintiff Friends of the Clearwater ("Friends") is a non-profit

conservation organization based in Moscow, Idaho.  Friends is dedicated to

protecting the National Forests and public lands of the Greater Salmon-Selway

Ecosystem in central Idaho.  Friends has actively advocated for protection of the

wolverine by sponsoring free public-education presentations about the wolverine in

Idaho, publishing articles about the wolverine in its newsletter, gathering

wolverine sightings information from the public agencies in the region, and

participating in public-involvement processes that affect wolverines and their

habitat.

11.    Plaintiff Greater Yellowstone Coalition ("GYC") is a conservation

organization dedicated to protecting and restoring the Greater Yellowstone

Ecosystem and the unique quality of life it sustains.  Formed in 1983, GYC is a

non-profit corporation and has approximately 90,000 supporters.  Central to

GYC's mission is maintaining the Greater Yellowstone Ecosystem's signature

populations of rare and imperiled wildlife, including the wolverine.

12.    Plaintiff Idaho Conservation League ("ICL") is a non-profit

conservation organization based in Boise, Idaho, that seeks to preserve Idaho's

clean water, wilderness and quality of life through citizen action, public education, and professional advocacy. ICL was founded in 1973 and today has approximately 10,000 members. ICL seeks to preserve Idaho's wildlife habitat for a variety of species, including the wolverine.

13.    Plaintiff Jackson Hole Conservation Alliance is a non-profit conservation advocacy organization based in Jackson, Wyoming with more than 2,000 supporters. The Jackson Hole Conservation Alliance works to protect the wildlife, wild places, and community character of Jackson Hole by empowering the whole community to live in balance with nature.

14.    Plaintiff Klamath-Siskiyou Wildlands Center ("KS Wild") is a non-profit organization incorporated in Oregon with offices in Ashland and Williams, Oregon. KS Wild has 3,500 members in more than 10 states, with most members concentrated in southern Oregon and northern California. KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins, and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities.

15.    Plaintiff Rocky Mountain Wild is a non-profit wildlife conservation organization based in Denver, Colorado, and has more than 7,600 members and

supporters.  Rocky Mountain Wild works to protect the biological diversity of the

Rocky Mountain West, and monitors the status of more than 500 species and

conserves core habitats that sustain wildlife and native plants.

16.    Plaintiffs' members and staff seek to observe, photograph, and study

the wolverine and/or signs of the wolverine's presence in its native habitat.

Members and staff of the plaintiff organizations also live and/or recreate

throughout the current and historic range of the wolverine.  Plaintiffs use and

enjoy, on a continuing and ongoing basis, the habitat of the wolverine and the

larger ecosystem upon which it depends.  Plaintiffs derive aesthetic, recreational,

scientific, inspirational, educational, and other benefits from these activities.

17.    An integral aspect of plaintiffs' interest in the wolverine is the

expectation and knowledge that the wolverine is present, healthy, and wild in its

native range.  Members of each of the plaintiff groups have conservation and

aesthetic interests in the continued existence of wolverines in the western

landscape in part because the reclusive wolverine is a living symbol of our nation's

remaining wilderness.  As the pioneering American wildlife biologist and

conservationist Olaus Murie once wrote, "I wonder if there is another inhabitant of

northern wilderness that so excites the imagination."  Olaus, Murie, A Field Guide

to Animal Tracks 66 (2d ed. 1974).  Murie described coming upon a wolverine

trail in an early winter snowfall:  "Merely seeing those tracks in the snow made it a

red-letter day." Id. at 68.  Plaintiffs have an interest in preserving the possibility of such experiences and activities in the future.  Plaintiffs' interest in the wolverine is entirely dependent on the continued existence of a healthy wolverine population in the wild.  Plaintiffs' members and staff have participated in efforts to protect and preserve the habitat essential to the continued survival of the wolverine.

18.    The legal violation alleged in this complaint causes direct injury to the aesthetic, conservation, recreational, inspirational, educational, and wildlife preservation interests of the plaintiffs and members of the plaintiff organizations. These are actual, concrete injuries to plaintiffs, caused by defendants' failure to comply with the ESA and its implementing regulations and policies.  These injuries would be redressed by the relief requested in this complaint.  Plaintiffs have no other adequate remedy at law.

19.    Defendant David Bernhardt is the United States Secretary of the Interior.  In that capacity, Secretary Bernhardt has supervisory responsibility over FWS.  The Secretary of the Interior is the federal official vested with responsibility for properly carrying out the ESA with respect to terrestrial mammals such as the wolverine.  Defendant Bernhardt is sued in his official capacity.

20.    Defendant Aurelia Skipwith is the Director of the United States Fish and Wildlife Service.  Defendant Spikwith is sued in her official capacity.

21.    Defendant United States Fish and Wildlife Service is a federal agency within the Department of Interior.  FWS is responsible for administering the ESA with respect to terrestrial wildlife such as wolverines, including species listing determinations under ESA Section 4.

## THE ENDANGERED SPECIES ACT

22.    The ESA was enacted to "provide a program for the conservation of … endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."  16 U.S.C. § 1531(b).

23.    The ESA is a call to species protection: a commitment, in the words of the U.S. Supreme Court, "to halt and reverse the trend toward species extinction— whatever the cost" by rejecting the "economic growth and development untempered by adequate concern and conservation" that gave this country its legacy of extinctions.  <u>Tennessee Valley Auth. v. Hill</u>, 437 U.S. 153, 154 (1978); <u>see</u> 16 U.S.C. § 1531(a)(1).

24.    To be protected by the ESA's conservation program, a species must first be listed under the ESA as endangered or threatened.  The ESA defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range."  <u>Id.</u> § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the

foreseeable future throughout all or a significant portion of its range." Id. §

1532(20).  The term "species" is defined to include "any distinct population

segment of any species of vertebrate fish or wildlife which interbreeds when

mature." Id. § 1532(16).  Under these definitions, FWS can list as endangered or

threatened a distinct population segment of a vertebrate species.

25.    To achieve the goal of conserving threatened and endangered species,

section 4 of the ESA requires the Secretary of the Interior to determine whether a

species is threatened or endangered, 16 U.S.C. § 1533(a)(l), designate critical

habitat for the species, id. § 1533(a)(3), and promulgate a recovery plan for the

species, id. § 1533(f).

26.    During the listing process, the ESA sets mandatory deadlines for

agency action.  One such deadline is that after publishing a proposed rule, the ESA

requires FWS to publish a final rule or withdraw the proposed rule within one year,

16 U.S.C. § 1533(b)(6)(A)(i), except that, upon finding "substantial disagreement

regarding the sufficiency or accuracy" of available scientific data, the Secretary

may extend the period for no more than 6 months for the purpose of "soliciting

additional data," id. § 1533(b)(6)(B)(i).  These deadline requirements are echoed in

the ESA's implementing regulations.  50 C.F.R. § 424.17(a)(1), (a)(1)(iv).

27.    "If the one-year period … is extended … with respect to a proposed

regulation, then before the close of such extended period the Secretary shall

publish in the Federal Register either a final regulation to implement the

determination … or a notice of withdrawal of the regulation … ."  16 U.S.C. §

1533(b)(6)(B)(iii); see also 50 C.F.R. § 424.17(a)(2).

28.    The ESA further provides that federal district courts "shall have

jurisdiction … to order the Secretary to perform" such nondiscretionary statutory

duties.  16 U.S.C. § 1540(g)(1)(C).

**THE WOLVERINE**

29.    The wolverine (Gulo gulo) is the largest terrestrial member of the

weasel family.  In attempting to describe the wolverine, the early American

naturalist Ernest Thompson Seton said as follows:  "The wolverine is a tremendous

character … a personality of unmeasured force, courage, and achievement so

enveloped in a mist of legend, superstition, idolatry, fear, and hatred, that one

scarcely knows how to begin or what to accept as fact.  Picture a weasel—and

most of us can do that, for we have met the little demon of destruction, that small

atom of insensate courage, that symbol of slaughter, sleeplessness, and tireless,

incredible activity—picture that scrap of demoniac fury, multiply that mite by

some fifty times, and you have the likeness of a wolverine."  Lives of Game

Animals (1928).

30.    Adult wolverines normally weigh 20 to 40 pounds and are three to

four feet long.  Wolverines typically exhibit a thick, glossy, dark-brown coat of fur,

often with a pale buff stripe running laterally from the shoulders along the animal's side and crossing the rump just above a long, bushy tail.

31.    Wolverines once ranged across the northernmost tier of the United States from Maine to Washington, and south into the Adirondacks of New York, the Rocky Mountains as far south as Arizona and New Mexico, and the Sierra Nevada-Cascade and Siskiyou Mountains as far south as California.  Today, the wolverine has been eliminated from all but a fragment of this historic range by the destruction of its wilderness habitat and trapping by European-American settlers. Wolverines were extirpated from the upper Midwest states by the early 1900s, and from the Northeast shortly thereafter.  Although lone male wolverines have within the past 10 years traveled to California and Colorado, wolverine populations are known to exist today in the contiguous United States only in the Rocky Mountain regions of Idaho, Montana, and Wyoming, in the Cascade Mountains of Washington, and in the Wallowa Mountains of eastern Oregon.

32.    Wolverines within the contiguous United States currently exist as a "metapopulation," or "a network of semi-isolated subpopulations" that "require some level of regular or intermittent migration and gene flow" to maintain genetic viability.  U.S. Fish and Wildlife Service, Threatened Status for the Distinct Population Segment of the North American Wolverine Occurring in the Contiguous United States; Proposed Rule, 78 Fed. Reg. 7,864, 7,867 (Feb. 4,

2013).  The entire wolverine metapopulation in the contiguous United States is

estimated to be just 300 wolverines or fewer.  U.S. Fish and Wildlife Service,

Threatened Status for the Distinct Population Segment of the North American

Wolverine Occurring in the Contiguous United States, 79 Fed. Reg. 47,522, 47,524

(August 13, 2014).

33.    The "effective population size" of wolverines in the lower-48 states—

meaning the portion of the population that engages in reproductive activities and

thereby passes on its genes to the next generation—is even smaller.  The effective

population of wolverines in the Northern Rocky Mountains, which is the largest

population in the contiguous United States, was estimated in 2009 (the most recent

estimate) to be only 35 individuals. This is well below the population the best

available science shows to be necessary to preserve both short-term and long-term

genetic diversity and viability.  78 Fed. Reg. at 7,884.

34.    Wolverines have large home ranges, often exist at high elevation, and

largely avoid humans and human infrastructure, making them an elusive species

that is difficult to track and count.  Alarmingly, however, monitoring information

suggests that wolverine populations have declined or vanished in three mountain

ranges in the Northern Rockies compared to population levels monitored from

2001-2010.

35.    Individual wolverines require large home ranges to access sufficient food to sustain themselves throughout the year, with the size of those ranges varying by habitat and food conditions, age, and gender.  Home ranges of studied wolverines in Idaho averaged approximately 1,522 square kilometers for adult males and 384 square kilometers for adult females.  In northwest Montana, adult males had home ranges of 422 square kilometers, while females occupied ranges averaging 288 square kilometers.

36.    Wolverines primarily rely on scavenging ungulates killed by other predators or by natural causes such as disease, injury, or weather.  Wolverines also prey on rodents and other small mammals, and are capable of taking even large ungulates such as deer, elk, and moose as live prey when the opportunity arises.

37.    Wolverines have a low reproductive rate.  Female wolverines attain sexual maturity at about 15 months, but fewer than half of potentially reproducing females actually produce young, known as kits, in any given year.  Wolverine litter size averages two to three kits in the years when a female does give birth.  On average, an Idaho study found that wolverines reproduced at a rate of less than one kit per female per year.

38.    Wolverines are a snow-dependent species and generally select as habitat areas that are cold and receive enough winter precipitation to reliably maintain deep, persistent snow late into the spring season.  This relationship with

13

snow is particularly important for female reproductive denning, and snow cover

during the wolverine denning period (February through May) appears to be

essential for successful wolverine reproduction at the southern end of the species'

range in the lower-48 states.  Although the precise reasons why female wolverines

choose den sites in deep snow are not known, scientists hypothesize that a den dug

deep below the surface of the snow provides protection from extreme cold in the

early spring and also protects young kits from predators.

39.    The best available scientific information indicates that climate change

will reduce the snowy habitat conditions upon which wolverines depend by 31

percent in 2045 and by 63 percent in 2085.  This projected habitat loss would

render remaining wolverine habitat significantly smaller and more fragmented,

which would threaten to cause decline of the wolverine's already small population

along with greater isolation of remaining wolverine subpopulations.

## WOLVERINES AND THE ENDANGERED SPECIES ACT

## I.    WOLVERINE LISTING HISTORY

40.    The wolverine's low population numbers and fragmented habitat in

the lower-48 states, together with the species' reliance on snowy alpine landscapes

that are rapidly disappearing in a warming climate, have given rise to efforts by

members of the public, including the plaintiffs here, to obtain new legal protections

for the wolverine under the ESA.  In response, FWS has repeatedly refused to

apply the ESA's protections to the wolverine, giving rise to a two-decade saga in which the public's repeated attempts to secure needed legal protections for this imperiled species have met with ongoing resistance from FWS, repeatedly requiring judicial intervention to compel FWS to take the actions required by the ESA.

41.     This saga began on July 14, 2000, when various conservation organizations, including certain of the plaintiffs here, submitted a petition to list the wolverine within the contiguous United States as a threatened or endangered species under the ESA and to designate critical habitat for the species.

42.     From 2000 to 2008, conservation groups were forced to seek judicial enforcement of the ESA on multiple occasions to overcome FWS's refusal to respond lawfully to this petition, including FWS's repeated failure to meet statutory deadlines.

43.     In October 2002, several conservation organizations sued FWS in federal court in Montana for failure to make a 90-day finding on the wolverine listing petition as required by 16 U.S.C. § 1533(b)(3)(A).  As a consequence of that lawsuit, FWS published a negative 90-day finding in October 2003.  68 Fed. Reg. 60,112 (Oct. 21, 2003).

44.     In response, in June 2005, conservation organizations again sued FWS in federal court in Montana, challenging FWS's negative 90-day finding.  In

September 2006, this Court held that FWS's negative 90-day finding was unlawful and ordered FWS to prepare a 12-month finding on the wolverine listing petition. Defenders of Wildlife v. Kempthorne, CV 05-99-M-DWM, slip. op. at 18-21 (D. Mont. 2006). The Court ultimately set a deadline of February 28, 2008 for FWS to publish a 12-month finding.

45.     FWS published its first 12-month finding, denying ESA protections for the wolverine, on March 11, 2008. 73 Fed. Reg. 12,929 (Mar. 11, 2008). Conservation groups again brought suit to challenge this finding and, on March 6, 2009, FWS agreed to settle that case by committing to issue a new 12-month finding on wolverine listing by December 1, 2010. 78 Fed. Reg. 7,864, 7,866 (Feb. 4, 2013).

46.     On December 14, 2010, nearly two weeks after the deadline, FWS finally published its 12-month finding, which determined that the wolverine within the contiguous United States constituted a distinct population segment that warranted listing under the ESA due to the predicted impacts of climate change and other threats. 75 Fed. Reg. 78,030 (Dec. 14, 2010). In its finding, FWS estimated wolverines were "likely to lose 63 percent of their current habitat area over the next century," and "by 2045, maintenance of the contiguous U.S. wolverine population in the currently occupied area will require human intervention to facilitate genetic exchange." Id. at 78,054. However, FWS still

refused to extend ESA protections to the wolverine, finding that an actual listing

decision was "precluded by higher priority listing actions." Id.

47.    Thereafter, FWS did not set a timetable for issuing a listing decision

on the wolverine until it was required to do so by a separate court settlement

addressing FWS's chronic backlog of listing determinations in litigation brought

by plaintiff Center for Biological Diversity. Endangered Species Act Section 4

Deadline Litig., Misc. Action No. 10-377 (EGS), MDL Docket No. 2165 (D.D.C.

Sept. 9, 2011). As part of this settlement, FWS agreed to issue a proposed listing

rule for the wolverine, or withdraw the "warranted" 12-month finding, by the end

of the 2013 Fiscal Year. Id.; see also 78 Fed. Reg. at 7,866.

48.    Pursuant to this settlement, on February 4, 2013, FWS issued a rule

proposing to list the distinct population segment of the North American wolverine

occurring within the contiguous United States as threatened under the ESA. 78

Fed. Reg. at 7,864. The proposed rule found that climate change posed a primary

threat to the wolverine's survival, and that trapping and small population size also

posed threats when acting in concert with climate change. Id. at 7,885-86.

49.    FWS concluded in the proposed rule that "[d]eep, persistent, and

reliable spring snow cover (April 15 to May 14) is the best overall predictor of

wolverine occurrence in the contiguous United States." Id. at 7,872 (citing Aubry

et al. (2007); Copeland et al. (2010)).

50.    As discussed, the best available scientific information predicts that the wolverine's snowy habitat will shrink dramatically as climate change progresses, with significant detrimental impacts on the species.  FWS's proposed rule accordingly concluded "[w]olverine habitat is projected to decrease in area and become more fragmented in the future as a result of climate changes."  78 Fed. Reg. at 7,877.  These habitat changes, in turn, "are expected to have direct and indirect effects to wolverine populations in the contiguous United States," posing a significant threat to the continued survival of this wolverine distinct population segment.  Id.

51.    After publishing a proposed rule, the ESA requires FWS to publish a final rule or withdraw the proposed rule within one year, 16 U.S.C. § 1533(b)(6)(A), 50 C.F.R. § 424.17 (a)(1), except that the Secretary may extend the period for six months for the purpose of "soliciting additional data" in response to "substantial disagreement regarding the sufficiency or accuracy of the available data," 16 U.S.C. § 1533(b)(6)(B)(i), 50 C.F.R. § 424.17 (a)(1)(iv).  In this case, FWS took the six-month extension, citing several states' and a few scientists' disagreement with the scientific information presented by FWS in its proposed rule.  79 Fed. Reg. 6,874 (Feb. 5, 2014).  With this extension, the ESA established FWS's new deadline for publishing a final determination on the proposed listing as August 4, 2014.  Id.

52.     In the months leading up to this deadline for final determination, FWS abruptly changed course from its findings in the proposed rule.  In particular, FWS's Mountain & Prairie Regional Director rejected the position advanced by the agency scientists who developed the proposed listing rule, including by rejecting the scientific information upon which the proposed rule had relied in reaching its determination.

53.     Accordingly, on August 13, 2014, nine days after the ESA statutory deadline to publish a final decision, FWS issued a withdrawal of its proposed listing determination for the wolverine.  79 Fed. Reg. 47,522.

54.     In October 2014, various conservation organizations filed suit in this Court challenging FWS's withdrawal decision.  On April 4, 2016, this Court ruled in favor of the conservation organizations, holding that FWS erred in withdrawing the proposed rule by dismissing threats to the lower-48 wolverine population arising from climate change and small population size.  See Defenders of Wildlife v. Jewell, 176 F. Supp. 3d 975, 1011 (D. Mont. 2016).

55.     This Court held that FWS "erred when it determined: (1) that climate change and projected spring snow cover would not impact the wolverine at the reproductive denning scale in the foreseeable future, and (2) that small population size and low genetic diversity do not pose an independent threat to wolverine viability in the United States.  By incorporating these determinations into the

[w]ithdrawal, [FWS]'s decision against listing the wolverine as threatened under the ESA is arbitrary and capricious. No greater level of certainty is needed to see the writing on the wall for this snow-dependent species standing squarely in the path of global climate change." Id.

56.    This Court therefore vacated and remanded FWS's withdrawal decision and highlighted the necessity for immediate action on the proposed wolverine listing, noting that "[i]t has taken us twenty years to get to this point.  It is the [Court's] view that if there is one thing required of [FWS] under the ESA, it is to take action at the earliest possible, defensible point in time to protect against the loss of biodiversity within our reach as a nation.  For the wolverine, that time is now." Id. at 1011-1012.

## II.    CHALLENGED AGENCY ACTION

57.    Notwithstanding this Court's explicit admonition for FWS to take action on the wolverine listing proposal "at the earliest possible, defensible point in time"—a time that the Court in 2016 characterized as "now," id.—FWS has failed to take any action to finalize the wolverine listing in the more than three years that have passed since this Court's decision.

58.    While FWS has continued to identify the wolverine as a candidate for listing, the agency has failed to take any action to render a final decision on the wolverine listing.  See 81 Fed. Reg. 87,246 (Dec. 2, 2016); 84 Fed. Reg. 54,732

(Oct. 10, 2019) (candidate notices).  Most recently, the Interior Department's Fall

2019 Regulatory Agenda promised a final wolverine listing decision in November

2019.  See Dep't of the Interior, Fall 2019 Unified Agenda of Regulatory and

Deregulatory Actions RIN: 1018-BB78, Office of Information and Regulatory

Affairs, available at

https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201910&RIN=1018

-BB78 (last accessed Mar. 16, 2020) (scheduling "Final Action" on wolverine

listing for "11/00/2019").  However, November 2019 passed with no final

determination on the proposed listing.

## CAUSE OF ACTION
**(Violation of Endangered Species Act – Failure to comply with statutory listing deadline)**

59.    Plaintiffs hereby reallege and incorporate Paragraphs 1 through 58,

supra.

60.    The ESA sets a mandatory deadline for FWS to publish a final rule or

withdraw a proposed rule concerning a listing determination within one year of

issuing notice of a proposed rule. 16 U.S.C. § 1533(b)(6)(A)(i); 50 C.F.R. §

424.17(a)(1).  The Secretary may extend the period for no more than 6 months for

the purpose of "soliciting additional data" in response to "substantial disagreement

regarding the sufficiency or accuracy of the available data." 16 U.S.C. §

1533(b)(6)(B)(i);  50 C.F.R. § 424.17(a)(1)(iv).  If the Secretary extends the

deadline, he or she must publish a final rule or withdraw the proposed rule before the end of the extension period.  16 U.S.C. § 1533(b)(6)(B)(iii); 50 C.F.R. § 414.17(a)(2).

61.    Here, FWS took the six-month extension, thereby establishing a deadline of August 4, 2014 to publish the final rule.  79 Fed. Reg. 6,874.  On August 13, 2014, nine days after the ESA statutory deadline to publish a final decision, FWS issued a withdrawal of its proposed listing determination for the wolverine.  79 Fed. Reg. 47,522.  This Court subsequently vacated and remanded FWS's withdrawal decision.  <u>See</u> <u>Defenders of Wildlife v. Jewell</u>, 176 F. Supp. 3d 975 (D. Mont. 2016).

62.    Courts interpreting statutory deadline provisions have repeatedly held that where, as here, an agency's final decision is challenged and subsequently vacated by a court, the status quo at the time of the unlawful decision is restored and the statutory deadline for the action is reinstated.  <u>See</u> <u>Sierra Club v. U.S. E.P.A.</u>, 850 F. Supp. 2d 300, 303 (D.D.C. 2012) ("When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect … .") (internal quotations omitted); <u>Sierra Club v. Johnson</u>, 374 F. Supp. 2d 30, 32-33 (D.D.C. 2005) ("status quo ante … was created by the [court's] vacatur of [the agency's] earlier action … that left unfulfilled [the agency's] duty to take final approval/disapproval action"); <u>Envtl. Def. v. Leavitt</u>, 329 F. Supp. 2d 55, 64

(D.D.C. 2004) ("When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect … ."); <u>Oxfam Am., Inc. v. Sec. & Exch. Comm'n</u>, No. 14-13648-DJC, 2015 WL 5156554, at *3 (D. Mass. Sept. 2, 2015) (holding that "the district court's decision to vacate the final … rule simply returned matters to where they stood before and that, in general, remand orders only serve to restore the status quo ante") (internal quotations omitted).

63.     This Court's 2016 decision vacating FWS's 2014 withdrawal decision therefore restored the status quo before the unlawful decision took effect—i.e., the status quo under which FWS had already passed the running of its deadline for a final decision pursuant to the 6-month extension that the agency took pursuant to 16 U.S.C. §1533(b)(6)(B)(i).

64.     FWS failed to take any action on the listing determination since the Court's 2016 decision.

65.     Accordingly, FWS violated the ESA when it failed to publish a final rule or withdraw the proposed rule within one year, 16 U.S.C. § 1533(b)(6)(A), 50 C.F.R. § 424.17(a)(1), or within the six-month extension period, 16 U.S.C. § 1533(b)(6)(B)(iii), 50 C.F.R. § 424.17(a)(2).

## PRAYER FOR RELIEF

THEREFORE, plaintiffs respectfully request that the Court:

1.      Enter a declaratory judgment that defendants' failure to issue a final listing determination on the proposed rule to list the wolverine in the contiguous United States as an endangered species or a threatened species violates the ESA and its implementing regulations;

2.      Order defendants to issue and publish a final listing determination on the proposed wolverine rule by a date certain to be set at the earliest possible time;

3.      Grant plaintiffs such further and additional relief as the Court may deem just and proper; and

4.      Award plaintiffs their reasonable fees, costs, and expenses, including attorneys fees, associated with this litigation.

Respectfully submitted this 18th day of March, 2020.


/s/ Timothy J. Preso
Amanda D. Galvan
Timothy J. Preso
Earthjustice
313 East Main Street
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org
amaxwell@earthjustice.org

*Attorneys for Plaintiffs*